# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50122

Consolidated w/ 14-51093

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

PETER VICTOR AYIKA,

> Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2016

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Western District of Texas

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Peter Ayika ("Ayika"), pro se, appeals his conviction and sentence based on healthcare fraud. He raises issues relating to the Speedy Trial Act, insufficiency of the evidence, Federal Rules of Evidence 403 and 404(b), the actual loss amount attributable to the fraud, restitution, forfeiture, the calculation of his sentence, and double jeopardy.

We reject Ayika's challenges to his conviction, sentence of incarceration, and order of restitution. In this appeal, however, the primary issue we address concerns forfeitable assets that may be seized to satisfy the money judgment entered against Ayika. We conclude that the district court erred to the extent

No. 15-50122 cons. w/ No. 14-51093

that it held that forfeitable assets arising from commingled funds could be seized under the procedures of 18 U.S.C. § 982(a)(7); but when a defendant's assets cannot be traced to the crime of conviction under § 982(a)(7), due to the defendant's commingling of legal and illegal assets, the Government may then invoke the provisions of 21 U.S.C. § 853(p) to satisfy the money judgment.

Accordingly, we VACATE the Preliminary Order of Forfeiture listing Ayika's forfeitable assets. We further VACATE the Judgment in a Criminal Case (the "Judgment"), in part, with respect to forfeiture (pages 9 and 10, which refer to those same assets), and REMAND for further proceedings with respect thereto. We AFFIRM the Judgment in all other respects.

I.

Ayika was a licensed pharmacist who owned and operated Continental Pharmacy ("Continental") in El Paso, Texas. In April 2011, Ayika was indicted for unlawfully possessing and distributing hydrocodone (the "drug case"). In August 2011, Ayika was charged in a second indictment with healthcare fraud, mail fraud, and wire fraud related to submission of fraudulent claims for healthcare benefits in connection with Continental (the "fraud case").

The drug case went to trial first. After a jury found Ayika guilty in the drug case, he entered a plea of guilty to Count One of the healthcare fraud indictment, which charged him with defrauding healthcare-benefits providers in an amount exceeding $1,000,000. In the drug case, Ayika was sentenced to concurrent terms of 60 months and 170 months in prison. In the fraud case, Ayika was sentenced to 63 months in prison, to run concurrently with his sentences in the drug case. The district court also ordered Ayika to pay restitution in the amount of $2,498,586.86, entered a money judgment against him in the same amount, and ordered the forfeiture of certain property to partially satisfy that money judgment.

No. 15-50122 cons. w/ No. 14-51093

Ayika appealed the judgments in each case. *Id.* Although Ayika's conviction in the drug case was affirmed, his guilty plea in the fraud case was vacated and the case was remanded.

On remand, Ayika pleaded not guilty and went to trial. After a jury trial, Ayika was again convicted on Count One of the healthcare fraud indictment. In the sentencing process, Ayika waived his right to a jury trial for his forfeiture hearing. Instead, the Government presented evidence of the actual and intended loss amounts caused by Ayika's healthcare fraud scheme, as well as various assets obtained and/or contributed to through these illegitimate funds. Ayika was sentenced at the bottom of the Guidelines range to 87 months in prison to run *consecutively* to his sentences in the drug case, three years of supervised release, and ordered to pay restitution in the amount of $2,482,901.93. The district court also entered a money judgment against Ayika in the same amount and ordered forfeiture of certain properties to satisfy the judgment.

Ayika has appealed his healthcare fraud conviction and sentence; and we address his arguments in turn below.

II.

First, we address Ayika's challenges to his conviction.

A.

Ayika argues that his indictment should have been dismissed based on violations of the Speedy Trial Act ("STA"). Specifically, Ayika contends that his healthcare fraud indictment should have been dismissed because: 1) his indictment on the healthcare fraud charges was "returned . . . approximately twenty nine (29) months" after his arrest (and was thus untimely under 18 U.S.C. § 3161 (b)); and 2) "two hundred and seventy one (271) days elapsed" between the reversal of his conviction and the start date of his trial (and was

3

No. 15-50122 cons. w/ No. 14-51093

thus untimely under 18 U.S.C. § 3161 (e)).  Ayika also contends that his counsel was ineffective for failing to raise these STA claims before the district court.

Because Ayika did not raise either of these STA violations before the district court before his trial, he has waived entitlement to relief under the statute.[1]  Because, however, Ayika also raises ineffective assistance of counsel ("IAC") claims in connection with these alleged STA violations, we must consider the underlying STA violations to determine the merits of the IAC claims.[2]

Turning to the IAC claims, to succeed Ayika "must show that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The Government argues that Ayika cannot meet this burden because he cannot point to a violation of 18 U.S.C. § 3161(b) or (e), much less show that he was prejudiced by his counsel's deficient performance.  We agree.

First, under 18 U.S.C. § 3161(b), "[a]ny . . . indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  Ayika, however, was never arrested for the healthcare fraud charges, but arrested only in connection with the 2009 drug

---

[1] *See* 18 U.S.C. § 3162(a)(2) ("Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section."); *United States v. Long*, 597 F.3d 720, 729 (5th Cir. 2010).

[2] Considering that Ayika also did not raise his IAC claims before the district court, we would normally decline to address them.  *See, e.g., United States v. Partida*, 385 F.3d 546, 568 (5th Cir. 2004) ("claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court") (citation omitted). The Government argues, however, that the record is sufficiently developed to allow this court to address these claims.  And it is true that in "rare cases" we may "consider such claims on direct appeal," but the "record must allow a reviewing court to 'fairly evaluate the merits of the claim.'"  *Id.*  (quoting *United States v. Delagarza–Villarreal*, 141 F.3d 133, 141 (5th Cir.1997)).  Here, we agree that the record contains sufficient detail to permit us to make a fair determination of Ayika's claims.

4

No. 15-50122 cons. w/ No. 14-51093

charges. Thus, Ayika cannot rely on his arrest date for the drug charges for the purposes of alleging an STA violation under 18 U.S.C. § 3161(b). Instead, because Ayika was never arrested in connection with the healthcare fraud charges, but indicted on those charges while in custody for the drug charge, he must rely on the return date of his healthcare fraud indictment (August 24, 2011), which was timely under § 3161(b). Accordingly, Ayika has not shown any error under § 3161(b).

Second, under 18 U.S.C. § 3161(e), "[i]f the defendant is to be tried again following a declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." Because Ayika miscalculated the start date for which the seventy-day period under § 3161(e) began to run,[3] and because there were several motions that tolled the seventy-day period,[4] less than 70 *countable days* passed before the start of his trial.[5]

---

[3] Ayika argues that the date this Court's opinion issued (February 12, 2014) ordering remand is the proper start date, but this is incorrect as the appropriate date is the issuance of the mandate for that opinion (March 6, 2014). *See also United States v. Holley*, 986 F.2d 100, 103 (5th Cir. 1993) (using the mandate date to calculate time under the STA).

[4] Excluded from the 70-day time period under § 3161(e) were several continuances granted by the district court. Contrary to Ayika's arguments in his reply brief, the orders of continuance, *which were all requested by Ayika*, expressly stated the district court's reasons for finding that the interests of justice outweighed the defendant's and the public's interests in a speedy trial. Thus, the district court's on-the-record-reasoning was sufficient to satisfy the requirements for ends-of-justice continuances under § 3161(h)(7)(A). *Cf. United States v. McNealy*, 625 F.3d 858, 862–63 & n.11 (5th Cir. 2010) (determining that stated reason for continuance of more trial preparation and statement that district court weighed continuance against the defendant's and public's interests in a speedy trial were sufficient to exclude continuance from 70-day time period).

[5] After excluding these continuance periods, only 60 days passed between this Court's March 6, 2014, mandate and Ayika's November 10, 2014, trial date. The Government argues that various pretrial motions were also filed before Ayika's trial and that the periods of delay while those motions were pending would also be excludable from the 70-day period. It is unnecessary, however, to include the pretrial motions in the calculation because § 3161(e) was satisfied solely by excluding the delays for continuances.

5

No. 15-50122 cons. w/ No. 14-51093

Accordingly, Ayika's counsel was not ineffective for failing to move to dismiss the indictment under the STA.  *Strickland*, 466 U.S. at 687.

Thus, Ayika has not shown any error by the district court under the STA, much less that he was prejudiced by his attorney's deficient performance in identifying or responding to such errors; and these claims fail as such.

## B.

Next, Ayika argues that the district court committed reversible error by allowing the introduction of his prior conviction in the drug case, contrary to Federal Rules of Evidence 403 and 404(b).  Specifically, Ayika contends that under Rule 403 this evidence was "inflammatory and prejudicial" and "obviously mislead the jury to convict" him on the healthcare fraud charges; and Ayika further contends that this evidence also constituted improper character evidence under Rule 404(b). (It is important to note that this evidence was presented to the jury only after Ayika took the stand to testify on his own behalf.).

To preserve either of his arguments, Ayika's objections to the introduction of this evidence, under Rule 403 or 404(b), must have been specific enough to alert the district court "to the nature of the alleged error and to provide an opportunity for correction." *See United States v. Ellis*, 720 F.3d 220, 224–25 (5th Cir. 2013) (internal quotation marks and citation omitted).  Ayika, however, did not object to the introduction of evidence of his drug conviction at any point in his healthcare fraud trial based on Federal Rule of Evidence 403 or 404(b); thus, "in the absence of a proper objection, we review [these claims] only for plain error." *United States v. Avants*, 367 F.3d 433, 443 (5th Cir. 2004).  Furthermore, our review for plain error is limited, as we "may not correct an error the defendant failed to raise in the district court unless there is '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005) (citation omitted).  Furthermore, "[i]f

No. 15-50122 cons. w/ No. 14-51093

all three conditions are met [we] may then exercise [our] discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Ayika's argument fails at the first step. The district court's ruling allowing the introduction of this evidence does not constitute error at all, as the introduction of such evidence is permissible under Federal Rule of Evidence 609(a). FED. R. EVID. 609(a) (allowing the Government to attack "a witness's character for truthfulness by evidence of a criminal conviction"); *see also United States v. Bray*, 445 F.2d 178, 181 (5th Cir. 1971) ("[A] defendant who takes the stand to testify in his own defense may be impeached by proof of prior felony convictions. This exception is well recognized in this Circuit."). Thus, Ayika cannot show error, much less that this error was plain.[6]

## C.

Next, Ayika argues that the district court erroneously denied his Rule 29 motion for acquittal based on the insufficiency of the evidence presented at his healthcare fraud trial. Ayika contends that because other "staff pharmacists and technicians" worked at his pharmacy, the evidence presented at his trial "lacked adjudicative facts to sufficiently link [him] to the false claim[s]."

Because Ayika preserved this objection before the district court, we review the sufficiency of the evidence de novo. Even so, our review of the

---

[6] Ayika was also warned several times before testifying that if he chose to testify in his own defense, then he would place his character at issue. Nevertheless, Ayika chose to testify, inviting any error he now alleges. "The accepted rule is that where the injection of allegedly inadmissible evidence is attributable to the action of the defense, its introduction does not constitute reversible error." *United States v. Doran*, 564 F.2d 1176, 1177 (5th Cir. 1977) (citation omitted). The district court warned Ayika that if he testified, then the conviction would be admissible. When Ayika decided to testify, the district court specifically informed him that he would be open to cross-examination and repeated, "[the Government] will most likely ask you about your conviction," and "[the Government] cannot go into details about it, but they can ask you if you've been convicted." Ayika responded, "I understand that." Indeed, it was Ayika who informed the jury that his prior conviction was a drug offense.

7

No. 15-50122 cons. w/ No. 14-51093

sufficiency of the evidence is "highly deferential to the verdict." *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002). The controlling inquiry for this claim is whether "a rational jury *could have found* the defendant guilty beyond a reasonable doubt . . . [considering that] the jury is free to choose among reasonable constructions of the evidence." *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007) (emphasis added) (citations omitted).

Considering the extensive evidence introduced at trial that demonstrated Ayika's involvement in the healthcare fraud—e.g., a confession signed by Ayika in conjunction with his prior guilty plea that conceded he had committed healthcare fraud; testimony that an examination of insurance company billing records and pharmacy prescription records showed that six companies paid $2,482,901.93 in healthcare benefits to Continental for 22,424 illegitimate, non-dispensed prescriptions; and evidence showing that Continental had one bank account (the "Chase account"), the primary purpose of which was receiving insurance reimbursements for prescriptions (and Ayika was the *only* party to directly control its profits)—we hold that a rational jury could have reached the verdict of guilt. Consequently, Ayika has not shown that the district court erred by denying his Rule 29 motion.

D.

In sum, for the reasons set forth above, we affirm the Judgment of conviction in all respects.

III.

We next turn to Ayika's challenges to the actual loss amount calculated by the district court, as well as the money judgment and restitution entered against him reflecting that loss amount. Specifically, the district court entered an Order of Money Judgment for $2,482,901.93. Ayika was then sentenced, and the Judgment ordered him to pay restitution in that amount.

8

No. 15-50122 cons. w/ No. 14-51093

Ayika argues that the district court committed reversible error in calculating the total actual loss amount attributable to the healthcare fraud and entering a money judgment and restitution against him in the same amount. In support of these challenges, however, Ayika provides only one argument: the district court erred by relying on the Government's calculation of the actual loss amount in the PSR because the Government failed to prove that the alleged loss, $2,482,901.93, was directly attributable to the healthcare fraud; instead he asserts the actual loss caused by the healthcare fraud was only $44,309.52. Accordingly, Ayika also contends that the money judgment and restitution amount are error. Ayika's arguments are unsupported.

Specifically, the Government had to show, by a preponderance of the evidence, only that the actual loss amount was a "reasonably foreseeable pecuniary harm that resulted from the [the healthcare fraud]." U.S.S.G. § 2B1.1 app. n. 3(A)(i). Furthermore, the calculation of the actual loss amount is a finding of fact, which "[t]he district court receives wide latitude to determine [] and [it] should make a reasonable estimate based on available information." *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) (citation omitted).

Here, the district court was entitled to rely on the findings presented in Ayika's PSR to calculate this amount, unless Ayika demonstrated that those findings were materially unreliable.[7] And, Ayika's mere objection to those findings, without more, did not provide "competent rebuttal evidence" requiring the district court to look elsewhere. *United States v. Alaniz*, 726 F.3d

---

[7] *See United States v. Ford*, 558 F.3d 371, 377 (5th Cir. 2009) ("In making its factual findings for sentencing, a district court may adopt the findings of the PSR without additional inquiry if those facts have an evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information is materially unreliable." (citing *United States v. Valles,* 484 F.3d 745, 759 (5th Cir. 2007)).

No. 15-50122 cons. w/ No. 14-51093

586, 619 (5th Cir. 2013); *see United States v. Slaughter*, 238 F.3d 580, 585 (5th Cir. 2000).

In this regard, Ayika's PSR provided that "from 2004 until March 2009 . . . *at least* 22,424 [fraudulent] claims for prescriptions allegedly written by [] physicians and/or prescriptions of individuals who were not patients," were submitted to insurance companies for payment. Of the total amount requested to be paid by the various insurance companies, $3,288,135.69 (the intended loss), $2,482,901.93 (the actual loss) was paid to Ayika.

Thus, the district court did not clearly err by relying on the Government's unrebutted calculation in Ayika's PSR when calculating the total loss amount.[8] Furthermore, it follows that the district court also did not err by entering a money judgment against Ayika and ordering him to pay restitution in this same amount.[9]

IV.

Next, Ayika challenges the forfeiture order with respect to its identification of certain forfeitable assets. Essentially, Ayika's argument is that even if the actual loss amount calculated by the district court ($2,482,901.93) is correct, the Government did not submit sufficient evidence that specific assets, set forth in the forfeiture order, can be traced to the healthcare fraud. The Government disagrees.

---

[8] The PSR also contained extensive evidence of the methodology used to calculate the actual loss caused by the healthcare fraud, which was corroborated at Ayika's trial by the testimony of Federal Agent Beaulieu and Forensic Accountant Perez.

[9] Ayika also argues that in calculating his sentence, the district court committed reversible error by incorrectly calculating the actual amount of loss he intended to cause and caused by the healthcare fraud. Because, however, the district court did not err in its calculation of these amounts, this claim fails.

10

No. 15-50122 cons. w/ No. 14-51093

A.

We keep in mind that criminal forfeiture is "an aspect of punishment imposed following conviction of a substantive criminal offense," *Libretti v. United States*, 516 U.S. 29, 39 (1995), and thus an "aspect of sentencing," *id.* at 49. Accordingly, we review the district court's findings of fact pertaining to a forfeiture order "under the clearly erroneous standard," and "the question of whether those facts constitute legally proper forfeiture *de novo*."[10]  *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005).

Because the Government seeks forfeiture of specific property, we "must determine whether the government has established the requisite nexus between th[at] property and the [charged] offense" under the applicable statute.  *See* FED. R. CRIM. P. 32.2(b)(1)(A).  And, "statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence." *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003).  Here, both parties agree that the applicable statute and standard for establishing this nexus is provided by 18 U.S.C. § 982(a)(7): "The court, in imposing sentence on a person convicted of a Federal healthcare offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, *directly or indirectly*, from gross proceeds *traceable* to the commission of the offense." 18 U.S.C. § 982(a)(7) (emphasis added).

---

[10] The Government seems to imply, but never directly addresses or argues, that we should review Ayika's forfeiture arguments for plain error because they are asserted for the first time on appeal. It is clear, however, that Ayika argued—at almost every stage of the trial—that the Government had not provided sufficient evidence that the assets it sought were directly forfeitable under § 982(a)(7) because the Chase account contained commingled, legitimate and illegitimate, funds.  *See, e.g.*, Motion to Dismiss Preliminary Order of Forfeiture, at 1–2 ("Defendant has established that the said subject properties were derived from hard-worked, gainful employments . . . [t]herefore, the subject properties should not be forfeited because they are fruit of legitimate gainful employment."); infra note 17.

No. 15-50122 cons. w/ No. 14-51093

B.

Under § 982(a)(7), the Government seeks the forfeiture of several separate assets by Ayika. Ayika presents separate arguments relating to each asset.

The Government's theory of this case, however, is straightforward, and persuasive—as it ultimately simplifies our analysis. Specifically, the Government seeks two types of assets for forfeiture: 1) the funds that remain in the primary operational account for Continental—the Chase account;[11] and 2) personal assets acquired with funds from the Chase account over the life of Ayika's healthcare fraud.[12] And, the Government contends that it is entitled to the forfeiture of both types of assets based on the same theory: Because they were derived from funds in an account, which received nearly all of Continental's income, these assets were derived from gross proceeds traceable to the healthcare fraud, and thus forfeitable under § 982(a)(7).

The Government offers the following evidence to prove the forfeitability of all these assets by breaking down the proceeds contributed to the Chase account over the period of Ayika's fraud: 1) of the $7.4 million that was deposited into the Chase account from "October 2004 through March 2009 . . . approximately $5.3 million of these deposits were payments from the . . . defrauded insurance compan[ies]" for approximately 65,000 prescription claims submitted through Continental;[13] 2) of the 34,449 prescription claims

---

[11] Only approximately $200,000 remains in the Chase account.

[12] Specifically, aside from the funds remaining in the Chase account, the Government seeks the forfeiture of: 1) funds contained in fifteen other accounts—as "[t]he evidence presented at the forfeiture hearing established that these funds were traceable to the Chase Account and, therefore, were also traceable to Ayika's healthcare fraud"; 2) two vehicles—because "[t]he loan payments for these vehicles were paid from the Chase Account"; and 3) Ayika's home, up to the "approximately $233,338.72 of funds from the Chase Account [that] were spent on mortgage payments and home improvements."

[13] Both the Government and Ayika agree that the remaining approximately $2,100,000 deposited into the Chase account during the relevant period came from sources

actually reviewed by the Government, 22,424 were fraudulent (65%); 3) of the $3,039,144.84 paid to Continental by the defrauded insurance companies for these 34,449 claims, $2,482,901.93 was paid for fraudulent claims; 4) in 2008-2009, the period immediately preceding Ayika's indictment, the "majority of prescriptions did not match up to any records held by Continental [(his pharmacy)]"; 5) "[i]n his post-*Miranda* interview, Ayika admitted that half of his billings were fraudulent"; 6) $7.4 million in revenue during the relevant time period was "inconsistent with the size and nature" of the pharmacy's business, as "gross profits . . . reached as high as 48% higher than the national average"; 7) there was no record of "deposits into the Chase account from the export and sale of cars"; and 8) "Ayika underreported his income, declaring approximately $6.4 million of income [during the relevant period] despite having received $7.4 million into the Chase account."

Ayika, on the other hand, argues that many of the funds deposited in the Chase account over the life of the account were derived from legitimate sources—"legitimate claims . . . [and] billings" in his legitimate pharmaceutical business, his and his wife's "wage income," and "funds from car sales and computer accessories exported overseas." Thus, Ayika contends, neither the funds that remain in the Chase account, nor the assets procured with funds contained therein over the life of the account, are subject to forfeiture under the plain language of § 982(a)(7) because the Government cannot show that they were derived from gross proceeds traceable *only* to his crime of conviction.

Concerning his and his wife's wage income and the proceeds from car and computer sales, however, Ayika has provided no competent evidence that contradicts the expert witness testimony provided by Forensic Accountant

---

other than the fraudulent insurance payments (e.g., payments from other insurance companies, copays, legitimate prescription payments by customers, and other pharmacy sales).

No. 15-50122 cons. w/ No. 14-51093

Deborah Perez at Ayika's trial and forfeiture hearing. For example, at Ayika's forfeiture hearing, Perez testified that all the money deposited into the Chase account over the life of the account came only from Continental business. In response, when cross examining her at that hearing, Ayika provided only argumentative responses to Perez concerning this testimony,[14] as well as other evidence that the district court found similarly unpersuasive.[15] We cannot say, therefore, that the district court clearly erred in dismissing these arguments of Ayika, which leaves only his argument that both legitimate and illegitimate proceeds from Continental business were deposited into the Chase account. *See Juluke*, 426 F.3d at 326.

Thus, at bottom, Ayika argues that the commingling of these proceeds over the life of the Chase account negates forfeiture of the remaining Chase account funds, as well as other assets, under § 982(a)(7). Accordingly, we will address the merits of these arguments in turn.

1.

First, Ayika argues that the Government has not proved that all of the funds in the Chase account were derived, directly or indirectly, from the proceeds of the healthcare fraud, nor that they are traceable to the fraud, because the Chase account also contained legitimate income from Continental.

The Government contends that, based on the evidence addressed above, *all* of the remaining funds were "more likely than not proceeds of Ayika's healthcare fraud."

---

[14] *See, e.g.*, Transcript of Forfeiture Hearing (Q: [W]hat you're saying that the revenue that comes into Chase account come only from Continental Pharmacy. Is that what you're saying? A. Correct. Q. That's not true.").

[15] For example, at his forfeiture hearing, Ayika submitted an "Annual Wages Summary Sheet" to the district court to show funds that were legitimately earned and then deposited into the Chase account. Because, however, Ayika did not point to any evidence showing that these funds were actually deposited into the Chase account, Perez's testimony was not controverted on this point.

14

No. 15-50122 cons. w/ No. 14-51093

As we have indicated, under § 982(a)(7), the Government has the burden to show that the funds remaining in the Chase account were: 1) funds directly or indirectly derived from gross proceeds of his fraud; and 2) that the funds were traceable to the healthcare offense. *See* 18 U.S.C. § 982 (a)(7).

Retracing our earlier steps, Ayika was convicted under Count One of the indictment, which alleged that Ayika executed a scheme to defraud healthcare benefit programs. Here, Ayika was convicted for submitting fraudulent claims to Medicaid, the Federal Employee Health Benefits Program (whose claims are processed by CVS/Caremark), Aetna, Humana, Medco, and Restat (the "six insurers"), claims for prescriptions never filled by his pharmacy, Continental. Thus, the Government must show that it is more likely than not that these remaining funds are proceeds of Ayika's fraud, and that they can be traced specifically to the fraud Ayika committed against these victim insurers.

We turn to the Government's showing discussed above. Of the approximately $7,400,000 that was deposited in the Chase account over the life of the healthcare-fraud scheme,[16] however, the Government has shown that only $2,482,901.93 of the deposits into the Chase account represent gross proceeds of the healthcare fraud against the six insurers;[17] that is to say, the

---

[16] The Government has asserted that *approximately* $7,400,000 passed through the Chase account during this period. *See, e.g.*, Testimony of Forensic Accountant Deborah Perez ("Over the time period from 2004 to March 2009, deposits were 7.4 million and withdrawals were 7.2, so that left a residual balance of approximately 200,000 in the bank."). Because Ayika does not object to this estimation, we adopt it for the purposes of this appeal.

[17] The Government put on unrebutted evidence that of all the funds deposited into the Chase account during the alleged healthcare fraud, the six insurers deposited approximately $5,300,000 worth of payments to reimburse more than 65,000 insurance claims. The Government also put on unrebutted evidence that of the sample of these claims it examined (approximately $3,000,000 worth of payments), 65% were fraudulent (totaling $2,482,901.93 worth of payments). Thus, the Government has provided acceptable evidence that $2,482,901.93 of the amount deposited into the Chase account was traceable to the healthcare fraud Ayika committed against these six insurers.

The Government did not provide any similar evidence concerning the remainder of these payments by the six insurers—approximately $500,000. And, furthermore, in regard

15

No. 15-50122 cons. w/ No. 14-51093

Government has shown that approximately 33.55% of the deposits into the Chase account, over the life of the account, were gross proceeds of the healthcare fraud of which Ayika was convicted.

2.

When evaluating the traceability of the funds in the Chase account, including the remaining funds in the account, we start, of course, with the premise that money is a fungible asset. *See Fungible*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("[I]nterchangeable with other property of the same kind."). Thus, when legitimate money and illegitimate money are placed in the same account, and various withdrawals and other deposits occur over time, there is no method to determine the exact source of any specific dollar or dollars. Here, however, we have ascribed some percentage of the total deposits to the account to Ayika's fraud; or, stated differently, the Government has shown that some percentage of the funds deposited in the Chase account were gross proceeds of the crime of conviction.

---

to the unexamined insurance claims paid by these six insurers—which made up another $2,300,000 deposited into the Chase account ($5,300,000 minus $3,000,000)—the Government, did not put on any evidence directly addressing the legitimacy of these claims, or establish any correlation that these funds might have had to Ayika's healthcare-fraud scheme.

Moreover, the Government concedes that it has not provided any evidence that the remaining funds in the Chase account (approximately $2,100,000 [$7,400,000 minus $5,300,000]), have a connection to these six insurers or Ayika's healthcare-fraud scheme. In fact, when cross-examining Forensic Accountant Perez at his forfeiture hearing, Ayika reiterated that: 1) the Government had not investigated, much less proven, the illegitimacy of these funds; and 2) these funds had no connection to the six insurers named in Ayika's indictment, facts which Perez confirmed ("Q. The flow chart you showed . . . it says, does it - - $2.163 million that was not accounted for? A. It was accounted for, sir. It was other insurance reimbursements . . . Q. And I think that the [$2.163] million comes from other insurance companies you guys have not investigated. Is that what you're saying? A. Yes."). And, the Government concedes this point on appeal ("The remaining $2.2 million of deposits consisted of payments from [] insurance companies [other than those named in Ayika's indictment], copays, payments by credit card or cash, and other pharmacy sales.").

Consequently, the Government has provided evidence only that $2,482, 901.93 of the funds deposited into the Chase account is traceable to the healthcare fraud of which Ayika was convicted.

No. 15-50122 cons. w/ No. 14-51093

But, still, we must go a step further and address whether any part of the $200,000 remaining in the Chase account can be "traced," for the purposes of § 982(a)(7), to Ayika's crime of conviction. The few courts that have fully addressed this inquiry have noted its difficulty, if not impossibility.[18] Neither we, nor any other circuit court, has adopted a particular standard for this specific inquiry under § 982(a)(7). But, other circuits have addressed traceability requirements in other statutes and other contexts.

3.

For example, Ayika points to *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), arguing that commingling can be so pervasive and protracted that tracing may become "virtually impossible." The Government does not cite or address *Voigt* in its briefing before us.

In *Voigt*, the Third Circuit addressed whether the Government could properly seek forfeiture, under § 982(a)(1), of jewelry procured with funds from an account containing both legitimate and fraudulent funds.[19] 89 F.3d at 1081. Not unlike the case before us, in *Voigt* the Government argued that because

---

[18] *See, e.g.*, *United States v. Louthian*, 2013 WL 594232, at *4 (W.D. Va. Feb. 15, 2013), *aff'd*, 756 F.3d 295 (4th Cir. 2014) ("Where fraudulently obtained funds are commingled with legitimately obtained funds, and additional withdrawals and deposits are made from and to the same account, the government likely cannot meet its burden of showing which funds are traceable to the [healthcare] fraud and which are not."); *United States v. Poulin*, 690 F. Supp. 2d 415, 428–29 (E.D. Va. 2010), *aff'd*, 461 F. App'x 272 (4th Cir. 2012) (holding that if assets derived illegally under 18 U.S.C. § 982(a)(7) are deposited "into an account that also contains legitimate receipts, and thereafter [the defendant] makes several withdrawals and additional deposits, the government will likely have a difficult time showing which money is 'traceable' to the fraud")).

[19] We note that although *Voigt* addressed § 982(a)(1), which is most often applied in the context of commingled assets "involved in" money laundering, similar to § 982(a)(7), § 982(a)(1) also contains the "traceable to" language of § 982(a)(7). Furthermore, considering the proximity and interrelationship of these terms within the same section of the same statute (§ 982(a)), we see no reason to vary from "the 'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" *C.I.R. v. Lundy*, 516 U.S. 235, 250 (1996) (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)).

the funds used to purchase the jewelry had some connection with the money laundering conviction, the jewelry was directly forfeitable under § 982(a)(1). The Third Circuit, however, disagreed and held that because the property was "purchased with funds from an account into which money laundering proceeds had been commingled with other funds," and from which "numerous intervening deposits and withdrawals" had occurred, the jewelry was not properly forfeitable under § 982(a)(1) because the funds with which it was purchased could not be traced to the illegitimate proceeds contained in the account. *Id.* at 1087–88. Here, like *Voigt*, there were many deposits and withdrawals of both legitimately and fraudulently obtained funds over the life of the Chase account. It would thus appear that, here, tracing the remaining funds under § 982(a)(7), as Ayika argues, would be virtually impossible.

It is true, of course, that *Voigt* arises in a slightly different context from the one here. Specifically, *Voigt* involved the traceability of assets (the jewelry) procured with general and unspecific commingled funds, whereas here we have to address the traceability of the commingled funds in the Chase account.

The Third Circuit, three years after *Voigt* was decided, however, addressed the traceability of commingled funds under § 982(a)(1). In *United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999), the defendant transferred $3,000,000 of fraudulent funds into an account that contained $160,000 of legitimate funds. Stewart was shortly thereafter arrested, the account was "immediately" frozen—aside from the $600,000 he was allowed to withdraw to pay his attorney for his defense—and the Government sought forfeiture of the account. *Id.* at 129. Relying on *Voigt*, the district court determined that because the remaining $2,600,000 was made up of commingled funds, those funds could not be forfeited under § 982(a)(1)—as their fungibility prevented traceability to the charged crime.

18

No. 15-50122 cons. w/ No. 14-51093

On appeal, however, the Third Circuit disagreed. The Third Circuit, reversing the district court, held that because the account was frozen immediately after Stewart deposited the illegal funds, and no substantial intervening withdrawals or deposits occurred thereafter, the "government clearly traced laundered funds . . . to Stewart's Account." *Id.* Thus, the court held that the entire $2,600,000 was *directly* forfeitable to the Government under 18 U.S.C. § 982(a)(1).[20]

But again, *Stewart* presents a slightly different picture from the one we are presented. The fraudulent funds in *Stewart* were deposited into an account that contained relatively insignificant legitimate funds, and the entire account was frozen before intervening deposits or withdrawals could occur. Here, however, Forensic Accountant Perez analyzed over 12,000 banking transactions over the life of the Chase account; and, as the Government concedes, many of these transactions involved legitimately-obtained funds.

In short, we are presented with facts that are distinguishable from both *Voigt* and *Stewart*, but together they provide guidance in resolving the case before us. Like *Voigt*, we read the plain language and requirements of tracing under § 982(a)(7), just as § 982(a)(1), to be demanding for establishing forfeiture, particularly as it relates to fungible assets. But, like *Stewart*, we agree that when the balance of a commingled, but largely static, account is sought for forfeiture, traceability under § 982(a)(7) can be possible.

Here, however, the Government's own witness analyzed over 12,000 transactions over the life of the account. And, as addressed above, Perez's testimony provided evidence only that 33.55% of the funds deposited into the

---

[20] Concerning the initial $160,000 in the account, "Stewart agreed that untainted money would be deemed withdrawn first." *Stewart*, 185 F.3d at 130. Thus, "[b]ecause the Account contained only $160,000 of untainted funds," and Stewart used $600,000 of the total fund to finance his attorney, the court concluded that the remaining funds presented no conflict under § 982(a)(1). *See id.*

No. 15-50122 cons. w/ No. 14-51093

Chase account, at various times over the life of the account, represented gross proceeds of the crime of conviction. Thus, in summary, we hold that the Government has failed to prove that it is, more likely than not, that the funds remaining in that account are traceable to Ayika's healthcare fraud against the six insurers. Accordingly, the district court erred in determining that the funds remaining in the Chase account were forfeitable under § 982(a)(7).

4.

But, our analysis does not end here. Instead, we turn to another statutory provision asserted in the pleadings and orders below, but not briefed in this appeal: 21 U.S.C. § 853(p) (the "substitute asset provision").[21]

In relevant part, § 853(p) allows for the forfeiture of *any property* of the defendant, up to the value of property that is otherwise forfeitable, if, "as a result of any act or omission of the defendant," the underlying forfeitable property "has been commingled with other property which cannot be divided without difficulty."[22]    21 U.S.C. § 853(p); *see United States v. Floyd*, 992 F.2d 498, 501 (5th Cir. 1993).

---

[21] Although the Government, on appeal, has not briefed or argued that is seeking substitute asset forfeiture under § 853(p), the Government's complaint alleged forfeitability under both § 982(a)(7) and § 853(p), as did every version of Ayika's PSR—including the one adopted by the district court in the Statement of Reasons for imposing the Judgment in this case—as did the Order of Money Judgment entered against Ayika. ("IT IS FURTHER ORDERED that the United States shall, at its option, be entitled to the forfeiture of any other property (substitute assets) owned by Defendant PETER VICTOR AYIKA up to the value of the Subject Money Judgment."). Thus, consideration of § 853(p), as it relates to the forfeitability of Ayika's assets, was properly before the district court and is proper for our consideration.

[22] Specifically, § 853(p) allows for the forfeiture of any of the defendant's property if the defendant has commingled property otherwise forfeitable under § 853(a), and cannot be divided without difficulty. In relevant part, § 853(a) provides for the forfeiture of any property "constituting, or derived from, any proceeds the person obtained, directly or indirectly," from the charged criminal activity or "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation[s]." *See* 21 U.S.C. § 853(a).

No. 15-50122 cons. w/ No. 14-51093

In the context of the facts presented in *Voigt*, as we have noted, the asset sought for forfeiture (the jewelry) was not traceable to the charged crime because it was purchased with commingled funds that, due to acts of the defendant, could not be divided without difficulty. *See Voigt*, 89 F.3d at 1087–88. Because the Government could not trace the asset to the crime of conviction, the Third Circuit held that the Government "*must satisfy* its forfeiture judgment through the substitute asset provision." *Id.* at 1088 (emphasis added). In response to the Government's arguments otherwise, the Third Circuit reasoned that Congress enacted § 853(p) to address the forfeitability of assets that fail to meet the traceability requirements of § 982(a)(1), but were purchased with commingled funds that could not be divided without difficulty; and courts could not ignore this provision in contravention of the purpose of the statute. *Id.* at 1087 ("[T]o accept the government's argument that 'traceable to' does not mean what it says for purposes of commingled property, in effect would render the substitute asset provision a nullity, in contravention of a well-settled canon of statutory construction that 'courts should disfavor interpretations of statutes that render language superfluous.'") (quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992)). We agree.

We further agree with the Third Circuit that the Government cannot, consistent with the statutes, treat § 982(a)(7) and § 853(p) as interchangeable. Put differently, § 853(p) is supplementary in the sense that the Government must first demonstrate that, through some act of the defendant, the asset represents commingled property so that it cannot be traced under § 982(a)(7) before it may proceed under the substitute asset provision of § 853(p). *See id.* at 1086 ("Clearly, if funds commingled in a bank account are sufficiently identifiable as to be considered 'traceable to' money laundering activity, then the substitute asset provision should have no applicability whatsoever.

21

No. 15-50122 cons. w/ No. 14-51093

Accordingly, the government's contention that the 'traceable to' and substitute asset theories merely create alternative paths to forfeiture, which the government may choose at its option, is illogical.").[23]

Moreover, *Stewart* further illustrates this application of the two statutes. *Stewart*, 185 F.3d 112. In reversing the district court's application of § 853(p), *Stewart* held that the entire $2,600,000 remaining in the commingled account was forfeitable to the Government under § 982(a)(1); this was true because there were no intervening transactions between the time when the illegitimate funds were deposited and the account was frozen that rendered the source of the illegitimate proceeds indeterminable. *Id.* at 129–30. The Third Circuit thus held that the Government had "clearly traced" the funds in the account that had been laundered (forfeitable under § 982(a)(1)); and, consequently, § 853(p) had no application. *Id.*

Thus, here, the volume of transactions that passed through the Chase account, the varying percentages of fraudulent billings paid by insurers and deposited, and other fluctuating factors characterizing the account, preclude the application of § 982(a)(7). To the point, the remaining funds in the Chase account, and Ayika's assets derived from funds of the Chase account,[24] are the

---

[23] *See also United States v. Bornfield*, 145 F.3d 1123, 1139 (10th Cir. 1998) ("An asset cannot logically be both forfeitable and a substitute asset. To allow such an anomaly would render the substitute assets provision meaningless.").

We do not mean to imply, however, that the application of one statute to partially satisfy the forfeiture judgment, necessarily precludes the application of the other to satisfy the same judgment. In fact, it is entirely plausible that the Government might pursue forfeiture of different portions of a single asset under the statutory provision that most directly applies to each portion.

[24] The Government has argued that these assets are traceable to Ayika's healthcare fraud only because they were purchased with funds from the Chase account. As addressed above, the Government has not provided evidence showing that the funds deposited into the Chase account over the life of the account represented proceeds traceable to the healthcare fraud, nor has it shown that these assets were derived from the fraudulent portion of the Chase account funds.

No. 15-50122 cons. w/ No. 14-51093

type of assets § 853(p) is intended to address, *see Voigt*, 89 F.3d 1050; *Stewart*, 185 F.3d at 129,[25] and on remand the district court may consider forfeiture under its provisions.[26]

C.

We sum up our discussion relating to the forfeitability of the Chase account and assets derived in part therefrom. We have held that the funds deposited into the Chase account over the life of the account, those that remain, and the assets purchased with funds therefrom, are not traceable to the crime of conviction and are hence not forfeitable under § 982(a)(7). We have further held that when the Government makes a showing that the defendant commingled funds, both legal and fraudulent, which cannot be divided without

Ayika also asserts that these assets are not proper for forfeiture because various members of his family have an interest in them. A third party's interest in otherwise forfeitable assets, however, must be addressed in an ancillary proceeding, only after *the third party* files a claim representing that interest. *See* FED. R. CRIM. P. 32.2 (b)(2)(A) ("The court must enter the [forfeiture] order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)."); *see also United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 684 (5th Cir. 2013) ("the only way in which a third party may assert an interest in the forfeited property is through an ancillary proceeding"); *United States v. Gordon*, 710 F.3d 1124, 1167 (10th Cir. 2013) ("third-party ownership disputes . . . 'do not factor into the court's determination whether to order the forfeiture of the property in the first instance'") (citation omitted).

[25] *See also In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1213 (11th Cir. 2013) (in which the court held that because the proceeds of a complex Ponzi scheme were commingled with legitimately earned income for four years, considering the "sheer volume of financial information available and required to separate tainted from untainted monies" it was "far more appropriate to apply the Third Circuit's rule in *Voigt* than the exception to that rule it lays out in *Stewart*.").

[26] *See* Fed. R. Crim. P. 32.2(e)(1) ("On the government's motion, the court may at *any time* enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . is substitute property that qualifies for forfeiture under an applicable statute.") (emphasis added); *cf. United States v. Duboc*, 694 F.3d 1223, 1227 (11th Cir. 2012) (holding that no provision under § 853 or Fed. R. Crim. P. 32.2(e)(1) limits the time during which the Government may seek substitute asset forfeiture). *See also* Fed. R. Crim. P. 32.2(e)(2) ("If the government shows that the property is subject to forfeiture under Rule 32.2(e)(1), the court *must* enter an order forfeiting that property, or amend an existing preliminary or final order to include it.") (emphasis added).

23

No. 15-50122 cons. w/ No. 14-51093

difficulty, and consequently rendered forfeitable assets untraceable to the crime of conviction under § 982(a)(1), the Government may turn to § 853(p). We therefore vacate the district court's Preliminary Order of Forfeiture, as well as the portion of the Judgment reflecting that order, found on pages 9 and 10 of the Judgment, and remand for reconsideration not inconsistent with this opinion.[27]

V.

Having addressed our holdings with respect to the forfeiture order, we briefly sum up our holdings in the whole of this opinion: We AFFIRM Ayika's conviction and sentence of incarceration in all respects; because the district court did not err in calculating the amount of actual loss caused by the healthcare fraud, we AFFIRM the Order of Money Judgment and sentence of restitution in that same amount; and we VACATE the Preliminary Order of Forfeiture, as well as pages 9 and 10 of the Judgment forfeiting Ayika's assets, and REMAND for reconsideration not inconsistent with this opinion. [28]

AFFIRMED in part;
VACATED, in part, and REMANDED.

---

[27] Because forfeiture is an aspect of sentencing, once the Preliminary Order of Forfeiture and pages 9 and 10 of the Judgment are vacated, the district court may conduct a new forfeiture hearing, and may even consider new evidence, *at its sole discretion. United States v. Carales-Villalta*, 617 F.3d 342, 345 (5th Cir. 2010) ("In the absence of a specific mandate and in the interest of truth and fair sentencing, the district court may consider any corrections and additions relevant to the issues addressed by this Court on appeal. Therefore, when the case is remanded for resentencing without specific instructions, the district court should consider any new evidence from either party relevant to the issues raised on appeal."); *see also United States v. Theall*, 609 F. App'x 807, 811 (5th Cir.), *cert. denied*, 136 S. Ct. 237 (2015) (applying *Carales-Villalta* in the context of a restitution order vacated and remanded for recalculation). As addressed above, however, we think it wise for the district court to proceed under the substitute asset provision of § 853(p).

[28] Ayika also appeals the district court's September 15, 2014, order denying his "Motion to Vacate or Set Aside Order of Motion to Dismiss Indictment" and his "Motion for Reconsideration [of Motion] to Dismiss Indictment," which the district court construed as a Renewed Motion to Dismiss Indictment. Because, however, Ayika has failed to address on appeal the district court's reasons for denying those motions those grounds for appeal have been abandoned. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006).

---

Furthermore, Ayika's motion for reconsideration of the clerk's order denying his motion to supplement the record with the detention order from his drug case and the affidavit supporting a search and seizure warrant issued in his drug case is denied.

Finally, Ayika contends that because he was resentenced to serve a term consecutive to his criminal drug sentence—whereas originally the two sentences were to run concurrently—the consecutive sentence violates the Double Jeopardy Clause of the Fifth Amendment. As we have previously held, however, "[d]ouble jeopardy does not preclude a sentencing authority from, upon a defendant's reconviction following a successful appeal, imposing 'whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction,'" as it is a "'well-established part of our constitutional jurisprudence . . . that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean.'" *United States v. Colunga*, 812 F.2d 196, 198 (5th Cir. 1987). Thus, this claim is meritless.