# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2020

Lyle W. Cayce
Clerk

No. 17-20492

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

FRANKIE LEE SANDERS;
PAMELA ANNETTE ROSE, also known as Pamela Annette Archbald,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, SMITH, and STEWART, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Pamela Rose ("Rose" or "Mrs. Rose") and Frankie Sanders ("Sanders") were executives at a company that provided rehabilitative services to injured federal employees. A jury convicted Rose and Sanders of conspiracy and fraud for participating in a plot to defraud the federal workers' compensation fund. Both challenge the sufficiency of the evidence and the district court's handling

No. 17-20492

of a recalcitrant witness.  Rose also protests the criminal forfeiture of several properties.  We affirm.

## I.  INTRODUCTION

### A.

Federal Work Ready ("FWR"[1]) was a health care business based in Houston.  FWR marketed itself to federal patients whose physical therapy ("PT") was reimbursable under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.*  FWR served hundreds of federal workers and received millions of dollars in reimbursements from the federal government.  It had PT clinics in several states, including Texas and Louisiana.

Mrs. Rose and Sanders co-owned FWR along with Jeffrey Rose ("Mr. Rose"), the defendant Rose's husband.  Mrs. Rose served as chief financial officer ("CFO").  Sanders was Vice President of Clinical Operations.  Mr. Rose was the chief executive officer ("CEO").  Other key personnel included John Cruise, the former chief operating officer ("COO"), and Dr. Hugo Jaime, a licensed chiropractor who oversaw PT and the medical professionals at FWR.

### B.

Health care providers such as FWR can receive payments for treating federal employees.  *See id.* §§ 10.800–10.826. The overwhelming majority of FWR's revenues came from reimbursements under FECA's workers' compensation program.  FECA benefits for injured workers include pay for up to forty-five days and, relevant to this case, certain medical expenses and rehabilitation services.  *See* 5 U.S.C. §§ 8103–04, 8118(b)(2); 20 C.F.R. § 10.0(b).  Those

---

[1] The company originally went as "Team Work Ready" ("TWR") but then became known as Federal Work Ready.  We'll refer to the overall company, and the main clinic in south Houston, as "FWR."

2

No. 17-20492

benefits are administered by the Department of Labor's ("DOL's") Office of Workers' Compensation Programs ("OWCP"). 20 C.F.R. § 10.1.

An intricate web of rules governs the submission of FECA claims. Providers such as FWR must itemize the claims using, *inter alia*, the Physician's Current Procedural Terminology codes, see *id.* § 10.801(b), a system created to provide a uniform and accurate description of health care services. Medical evidence must support every claim. *Id.* § 10.801(a). And when a provider submits one, it certifies "that the service . . . was performed as described, necessary, appropriate and properly billed in accordance with accepted industry standards." *Id.* § 10.801(d).

Prohibitions abound. Providers understandably cannot "upcod[e] billed services for extended medical appointments when the employee actually had a brief routine appointment." *Id.* Nor can they "charg[e] for the services of a professional when a paraprofessional or aide performed the service." *Id.* And, since FECA claims must be submitted "in accordance with accepted industry standards," *id.*, claims filed under codes for one-on-one treatment must have been performed one-on-one.

## C.

By 2013, FWR's business was cooking. But the government smelled something foul. It started an investigation of impressive scope, involving undercover agents, confidential informants, audio and video surveillance, subpoenaed bank and business records, and more than two hundred interviews. What investigators uncovered was a scheme to defraud DOL of FECA funds. Evidence at trial suggested that the following practices regularly occurred at FWR's various clinics. Sanders and Rose largely do not contest that these practices existed.

3

No. 17-20492

First, despite regulations restricting aides from providing the reimbursed care, *see* 20 C.F.R. §§ 10.5(o), 10.801(d), unlicensed and untrained technicians supervised PT. Several employees testified that they *never* saw a licensed professional provide treatment.

Second, activities were regularly billed using one-on-one codes, but employees never saw patients receive individual attention. Indeed, FWR did not employ enough staff to provide the billed PT, even *if* the staff had possessed the required medical credentials.

Third, patients often did no therapy at all, even though FWR was billing their time. Instead, patients sat around, text messaged, played video games, watched TV, and self-performed unnecessary exercises.

Fourth, treatment plans were based not on individual patient needs, but instead on a "cheat sheet" that management created. The sheet categorized what would maximize OWCP billings by exercise type and time allotted. Patients were thus alternated among different codes based on what was most profitable. Often, medical documents were mere copies of old ones reused on new patients. One doctor testified that, as a result, patients' health routinely deteriorated.

Finally, technicians were ordered to falsify treatment records so as to increase revenue. Sometimes, records were changed to reflect that a patient received therapy for longer than actually occurred. Other times, forms were altered to make it appear that FWR was complying with federal regulations.

D.

There was extensive trial testimony about Sanders and Rose's alleged involvement in the fraudulent scheme. We explain in detail.

No. 17-20492

1. Mrs. Rose

Mrs. Rose, as CFO, was number three in rank and oversaw FWR's financial affairs. Mr. Rose was the CEO and main protagonist[2] of the deceitful business practices.

Mrs. Rose "was very involved" in discussions about how much money was being collected at FWR clinics. She attended the weekly executive-team meeting along with Mr. Rose, Sanders, and others. The participants regularly discussed how to inflate billings on existing clients, and Mr. Rose would often become very upset when he learned that a clinic wasn't hitting its numbers.

Despite Mrs. Rose's steep involvement with the finances, she didn't interact much with FWR's clinical side, and she didn't submit the OWCP bills for reimbursement. When Mrs. Rose gave one of FWR's doctors, Andrea Smith, an oral evaluation, Rose told Smith that one of "her objectives must be tied to profit" and that, going forward, she would be evaluated on how much billing revenue she brought in. Mrs. Rose informed Smith that Smith would still get a raise, but that, in the future, her salary would be tied to her clinic's numbers. Rose acknowledged that Sanders had already spoken with Smith about increasing billings. Rose also signed the written evaluation that admonished Smith for "not maximiz[ing] patient treatments."

On July 11, 2013, the government served search warrants at some of the clinics. Immediately, Rose called Cruise (the COO at the time) at his home and ordered him to go to the office. Once he arrived, investigators questioned him. Cruise called Mrs. Rose after leaving the office and filled her in. Wasting

---

[2] Trial witnesses suggested that Mr. Rose ring-led the fraudulent scheme at FWR. Among many other things, he pressured employees to maximize billing and browbeat them into falsifying documents. And he fed the company's culture of excessive focus on billing and of falsifying OWCP claims.

no time, Mrs. Rose told Cruise to meet her and Mr. Rose at the bank where they stashed FWR's money in various accounts. Mrs. Rose wanted the team "to pull all the money out . . . and put those funds in another account" so as "to hide the money from the federal government so it wouldn't be seized." Twelve transfers later, and the Roses had moved $700,000 from the FWR accounts into a brand new Chase account, held in the name of Pure Vanity Boutique, Inc. ("Pure Vanity"), a corporation newly created by the Roses.[3] That same night, the Roses, Sanders, and others met at a restaurant to discuss the warrants. The Roses didn't mention the money transfers.

A formal executive meeting was also called following the warrants, and Mrs. Rose attended. The meeting was secretly recorded. Mr. Rose had instructed Cruise to find a company to sweep the executive office for listening devices, and, at the meeting, Cruise reported that no bugs had been found. In unison, Mrs. Rose and her husband exclaimed, "praise the Lord."

### 2. Sanders

Sanders, as the VP of Clinical Operations, was intimately involved with FWR's clinical matters. He worked closely with the staff and doctors, helped open OWCP claims, and was the company's expert on compliance with the federal rules governing FECA.

Sanders was also occupied with OWCP billings. He went to the billing department with Mr. Rose several times a day, and billing information was daily sent to him. He also attended the weekly meetings where the executives discussed how to maximize billings.

Sanders had a sharp focus on boosting revenue per patient. He repeatedly told doctors at FWR that maximizing billing was of paramount

---

[3] A few days later, some of the money was transferred back.

importance.  When one doctor, Melissa Hoffman, objected to the quantity of PT ordered for some patients, Sanders told her to order it anyway.  He gave a doctor a flowchart describing how to perform intake of a new patient, and the form stressed the importance of focusing on "compensable area[s]" of treatment.  Sanders submitted agenda items for meetings about "maximizing treatment for patients."  He fired one employee because she refused to "follow directions" by lying about patients' exam results.

Sanders's comments during Dr. Smith's oral evaluation were particularly revealing.  He told her that "[w]e literally have to maximize whatever is available to the patient" and admonished that Smith needed to do better on that front.  Apparently aware that his comments pushed boundaries, Sanders clarified that he didn't want Smith to do something "unethical or immoral."  When Smith replied by suggesting that FWR was providing unnecessary therapy, Sanders argued with her, asking why the patients couldn't do more exercises.  Smith responded, "why are you pushing it?", and Sanders replied, "because we get paid for it if we push it."  He continued, "if it's not going to be negatively detrimental to them, why wouldn't I give them eight more minutes and . . . bill for the eight more minutes?"  If doing extra time "would yield an increase to" the clinic's finances "and not yield a negative impact to the patient, then I don't understand why that would be problematic."  He then repeatedly asked Smith whether it would be unethical to order more.  Sanders also signed Smith's written evaluation, which, as seen above, criticized her for "not maximiz[ing] patient treatments."

On the day of the search warrants, Sanders was present at the restaurant where the team, including the Roses, debriefed.  He also attended the later executive meeting.  There, he and Mr. Rose spoke about issues with a local clinic.  They discussed how one of FWR's doctors, Dr. Key, needed to visit the

No. 17-20492

clinic more often so that Key could provide the necessary signatures for OWCP billings, since no government-licensed doctor was currently onsite. Sanders stressed that Key needed to visit so that DOL couldn't "say that he wasn't there."

E.

The government charged Mrs. Rose, Sanders, Mr. Rose, and Dr. Jaime with an array of federal crimes. In Count 1 of a second superseding indictment, all four defendants were charged with conspiracy to commit health care fraud and wire fraud. In Counts 2–18, the same crew was accused of committing health care fraud and aiding and abetting. Counts 19–23 charged the same defendants with wire fraud and aiding and abetting. And Counts 24–25 accused the Roses only of conspiring to engage in a monetary transaction in criminally derived property ("money laundering") and aiding and abetting.

A lengthy trial ensued with over three dozen witnesses. They included patients, former employees and doctors, experts, undercover agents, Cruise, and Dr. Jaime, who was the only defendant to take the stand during the guilt phase. After the government rested, Sanders and the Roses moved for a judgment of acquittal, *see* FED. R. CRIM. P. 29, which the court reserved for later resolution.

Dr. Jaime was acquitted, but Mrs. Rose, Sanders, and Mr. Rose were convicted as charged. All three moved again for acquittal, and, this time, the court denied relief. The same jury was then retained for a forfeiture trial and rendered a special verdict finding six of the Roses' properties to be criminally forfeitable.[4] Only Mrs. Rose and Sanders appeal.

---

[4] Sanders was eventually sentenced, among other things, to 300 months. Mrs. Rose got 120 months.

No. 17-20492

## II. SUFFICIENCY OF THE EVIDENCE

Defendants contend that there wasn't enough evidence to convict them on any count. When a defendant timely moves for a judgment of acquittal, as Rose and Sanders did, "we review challenges to the sufficiency of evidence *de novo*, but view the evidence in the light most favorable to the verdict." *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (per curiam) (cleaned up).

"[A] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). We must affirm if a "*rational* jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (per curiam) (emphasis added). One definition of "rational" is that which is "not absurd, preposterous, foolish, or fanciful." *Rational*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In so doing, we ask whether the verdict was reasonable, not whether it was correct. *United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013). We accept any reasonable inferences that support the verdict and resolve any conflict in the evidence in favor of it.[5] The jury can "choose among reasonable constructions of the evidence." *United States v. Lugo-Lopez*, 833 F.3d 453, 457 (5th Cir. 2016) (per curiam). Nonetheless, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

---

[5] *United States v. Velasquez*, 881 F.3d 314, 328–29 (5th Cir.) (per curiam), *cert. denied*, 139 S. Ct. 138 (2018).

No. 17-20492

A.

Defendants first challenge their Count 1 conviction of conspiracy to commit health care and wire fraud in violation of 18 U.S.C. § 1349.

1.

To prove a conspiracy to commit health care fraud, the government must show "beyond a reasonable doubt that: (1) two or more persons made an agreement to commit health care fraud[6]; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement with the intent to further the unlawful purpose." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (cleaned up); *see* 18 U.S.C. § 1349. The same elements apply to a conspiracy to commit wire fraud, except that the participants must agree to execute wire fraud. *See United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015).

Criminal conspiracies can be established on circumstantial evidence alone. *United States v. Sutherland*, 656 F.2d 1181, 1188 (5th Cir. Unit A Sept. 1981). Indeed, a jury can infer from the surrounding circumstances whether a defendant participated in and knew of the conspiracy. *See United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015). "What people do is . . . evidence of what lies in their mind." *Ganji*, 880 F.3d at 768.

The central feature of a conspiracy is the agreement,[7] but it doesn't need to be formal or even spoken. *See id.* at 767. It can "be inferred from concert of action." *United States v. Frydenlund*, 990 F.2d 822, 825 (5th Cir. 1993). Even so, the agreement "cannot be lightly inferred." *Ganji*, 880 F.3d at 768. "Mere

---

[6] The crime of health care fraud generally applies to a defendant who schemes to defraud a health care benefit program. *See* 18 U.S.C. § 1347.

[7] *See United States v. Alvarez*, 610 F.2d 1250, 1255 (5th Cir.), *on reh'g*, 625 F.2d 1196 (5th Cir. 1980) (en banc).

similarity of conduct among various persons and the fact that they have associated with or are related to each other is insufficient," standing alone, "to prove an agreement." *Id.* at 767–68 (quotation marks removed).

### 2.

Enough evidence supported Rose's and Sanders's Count 1 convictions.

### i.  Sanders

Start with Sanders.  The government was permitted to establish the conspiracy on circumstantial evidence alone.  *See Sutherland*, 656 F.2d at 1188.  It did.  First, there's enough evidence that Sanders was party to an *agreement* to commit health care and wire fraud.  An agreement can "be inferred from concert of action," *Frydenlund*, 990 F.2d at 825, and repeatedly Sanders was shown teaming up with others as he participated in the company's culture of fraudulent billing, *see United States v. Anderson*, 558 F. App'x 454, 459 (5th Cir. 2014) (per curiam) (noting that the conspirators "worked in tandem").

Take several examples.  Sanders attended both of the anguished post-search-warrant meetings with his fellow executives, in which the team debriefed the startling events and rejoiced upon learning that listening devices hadn't been found in the executive office.  At the later meeting, he strategized with Mr. Rose about how to get the clinic that wasn't following federal regulations into compliance.  He went with Mr. Rose several times a day to the billing department, and he participated in the weekly meetings that saw frequent discussion of how to increase billings.  And his evaluation of Dr. Smith, which emphasized that she needed to order more therapy for patients, was done with Mr. and Mrs. Rose in tow.  A rational juror could have inferred that Sanders acted in concert with others only because he'd agreed to do so.  *Cf. Frydenlund*,

990 F.2d at 825.

There's also enough evidence that Sanders knew the unlawful purpose of the agreement and wanted to further it.  The fraudulent scheme at FWR involved, among other things, overbilling and misrepresenting what services were performed, charging for unnecessary care, and delegating PT to un-trained technicians.  And "the government produced evidence that [Sanders was] not only aware of the fraud, but actually helped perpetrate [it]." *Kuhrt*, 788 F.3d at 416.

Indeed, Sanders was excessively focused on maximizing billings.  He fired one employee for refusing to lie on documents.  He admonished Dr. Smith for failing to bill extra time for patients who Smith said didn't need it.  He overruled another doctor's objection to how much therapy was being ordered.  At the post-warrant executive meeting, he spearheaded the effort to get Dr. Key to the noncomplying clinic so that DOL couldn't "say that he wasn't there." He was very involved in the clinical side of the business, and he was the com-pany's expert on DOL and the FECA rules.  And, of course, he was in executive leadership.  All of that evidence shows his knowledge and intent.

## ii. Rose

There's also enough evidence that Rose was part of a conspiracy to com-mit health care and wire fraud.  She too participated in the company's culture of questionable billing practices.  "She was very involved" in discussions about billings.  During Dr. Smith's evaluation, she told Smith that Smith needed to bring in more money and that her salary would be tied to profits.  She signed the written evaluation that criticized Smith for failing to pad billings.[8]  And

---

[8] Rose points out that focusing on profit isn't illegal.  But the fraudulent scheme at FWR was predicated on overbilling and billing for services that weren't compliant or neces-sary.  So, the jury could have interpreted Rose's focus on maximizing billing as evidence she

she attended the weekly meetings where maximizing billings was regularly discussed and where her husband frequently became upset about their paucity.

Then, of course, there is her revealing behavior after the search warrants were served. Instead of asking why agents were snooping around, Rose ran to the bank and shifted money between accounts, all in the name of "hid[ing it] from the federal government." At the executive meeting that followed, she thanked the powers above when Cruise reported that no listening devices had been found in the office. That is not behavior we'd expect of an executive who was unaware of and didn't participate in the fraud. Rose's "efforts to assist in the concealment of a conspiracy may help support an inference that [she] had joined [it]."[9]

The same evidence also supports that Mrs. Rose was a party to an agreement. She acted with others in hiding funds from the government, attending the post-warrant meetings, and admonishing employees for failing to maximize billings, among other events. *See Frydenlund*, 990 F.2d at 825 (recognizing that agreements can be inferred from concerted action). All of that evidence, combined with her marriage to Mr. Rose, the ringleader, and her number three position in a company permeated with fraud,[10] is enough to sustain the conviction.

---

participated in the scheme. *See Lugo-Lopez*, 833 F.3d at 457 (stating that the jury can pick among reasonable constructions of the evidence).

[9] *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. Unit A Oct. 1981); *see also United States v. Martinez*, 921 F.3d 452, 470 (5th Cir.) ("[Defendant] also closed the bank account he had opened two days after a search warrant was executed . . . . [T]he jury could have viewed this as evidence of knowledge."), *cert. denied*, 140 S. Ct. 571 (2019).

[10] *See United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014) (characterizing as circumstantial evidence the existence of a family relationship and the defendant's position of authority within the organization).

No. 17-20492

3.

To the extent any objections remain to Sanders's and Rose's Count 1 convictions, they lack merit. Defendants posit that we should set aside their convictions because no witness *directly* implicated them in the conspiracy. Yet the government was permitted to (and did) establish the conspiracy on circumstantial evidence alone. *See Sutherland*, 656 F.2d at 1188. "[T]he defendants cannot obtain an acquittal simply by ignoring inferences that can logically be drawn from the totality of the evidence." *Martinez,* 921 F.3d at 466.

Rose and Sanders proffer some indicia of innocence and conclude that reversal should follow.[11] But we must "view the evidence in the light most favorable to the verdict,"[12] and "[t]he evidence need not exclude every reasonable hypothesis of innocence," *Lugo-Lopez*, 833 F.3d at 457. In light of the evidence reviewed above, defendants' apparent exculpating evidence could have failed to create doubt in the mind of a rational juror.

Defendants suggest that *Ganji*, 880 F.3d at 773, requires reversal. It does not. In that case, we vacated the convictions of two defendants for conspiracy to commit health care fraud. *Id.* at 778. For one defendant, Davis, all the government could muster was evidence that Davis "should have known" that her employees were executing a fraudulent scheme—not that she *did* know. *Id.* at 776 (emphasis removed). And, for the other defendant, Ganji, there was no evidence whatsoever that she had participated in any unlawful agreement. *Id.* at 773. The confessed ringleaders of the scheme testified that

---

[11] Sanders notes testimony that he told employees not to do anything unlawful. He points out that Dr. Jaime testified that Sanders never ordered him to falsify medical records, billing hours, or DTNs. Rose urges that she wasn't involved with clinical matters and frequently was at work for only a few hours and that Jaime testified he didn't see her do anything fraudulent.

[12] *Gonzalez*, 907 F.3d at 873 (quotation marks removed).

they didn't know Ganji and hadn't worked with her. *Id.* at 770.

*Ganji* involved quite a different story. There's evidence of Rose's and Sanders's participation that goes far beyond a theory that they should've known what was going on. They knew. Key players, such as Cruise, provided testimony showing both of them working in concert with others to accomplish the illicit goals. *Ganji* is inapt.

Sanders contends that Dr. Jaime's acquittal was inconsistent with Sanders's conviction. But even if that questionable premise were true, it wouldn't require reversal. "[I]nconsistent verdicts are not a bar to conviction so long as there is sufficient evidence to support the jury's determination of guilt," *United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999),[13] and there was "ample" evidence of Sanders's guilt, as the district court correctly observed.

Relying on *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978), Rose conte4nds that her conviction cannot stand merely because she was married to the chief miscreant. But the evidence of Mrs. Rose's conspiratorial activity goes much further than the fact of her marriage to Mr. Rose. And regardless, the jury was permitted to consider the marriage as circumstantial evidence of knowledge. *See Willett*, 751 F.3d at 340. The convictions of conspiracy to commit health care and wire fraud were adequately supported.

B.

Mrs. Rose and Sanders maintain that there was insufficient evidence supporting their convictions for health care fraud and aiding and abetting (Counts 2–18) in violation of 18 U.S.C. §§ 1347 and 2, and wire fraud and aiding and abetting (Counts 19–23) in violation of 18 U.S.C. §§ 1343 and 2. The health care fraud counts referenced individual OWCP billings that were

---

[13] To his credit, Sanders conceded this point.

No. 17-20492

allegedly inaccurate.[14]  The wire fraud counts were tied to payments from DOL Treasury to a bank account held in FWR's name.  As above, there was sufficient evidence.

1.

To prove health care fraud, the government had to show that the defendants either (1) "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice . . . to defraud any health care benefit program;" or (2) "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program . . . ."  18 U.S.C. § 1347(a); *see also United States v. Mahmood*, 820 F.3d 177, 185–86 (5th Cir. 2016).  "[T]he government must show [that the defendant] participated in the scheme to defraud, not that he took part in every aspect of that scheme."  *United States v. Tencer*, 107 F.3d 1120, 1127 (5th Cir. 1997) (mail fraud case).

Next, "[i]n a wire fraud prosecution, the government must prove that (1) a scheme to defraud exists, (2) the defendant used wire communications in interstate or foreign commerce to further that scheme, and (3) the defendant had specific intent to defraud."[15]  "[O]nce membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme."  *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009) (brackets removed).

---

[14] As one example, Count 2 charged that a bill had been submitted for services rendered to patient "Bryan B." that were "not provided as billed."

[15] *United States v. del Carpio Frescas*, 932 F.3d 324, 329 (5th Cir.) (per curiam), *cert. denied*, 140 S. Ct. 620 (2019).

No. 17-20492

Finally, consider aiding and abetting.  It "is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit." *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992).  To prove it, the government needed to show, in the context of this case, that (1) health care and wire fraud were "committed by someone,"[16] and "(2) the defendant associated with the criminal activity, participated in it, and acted to help it succeed."[17]

"It is not necessary . . . that one charged as an aider or abettor commit the overt acts that . . . accomplish the offense or that he have knowledge of the particular means his principals . . . employ to carry out the criminal activity." *United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir. 1978).  Similarly, there needn't be proof "that the defendant was present when the crime was committed or that he actively participated therein."  *United States v. James*, 528 F.2d 999, 1015 (5th Cir. 1976).  Instead, liability under 18 U.S.C. § 2 "results from the existence of a community of unlawful intent between the aider or abettor and the principal." *Austin*, 585 F.2d at 1277 (cleaned up).

Neither Sanders nor Rose contests the first element of aiding and abetting—namely, that, someone committed health care or wire fraud with respect to each count.[18]  Instead, they plead that they didn't know about or help the fraud.  We follow their lead and evaluate whether the evidence was sufficient to show that they associated with, participated in, and acted to help

---

[16] *United States v. Collins*, 774 F.3d 256, 263 (5th Cir. 2014).

[17] *United States v. Barnes*, 803 F.3d 209, 216 (5th Cir. 2015).

[18] *See Collins*, 774 F.3d at 263.  Rose concedes that "the evidence in this case might allow a juror to infer that there were some violations of FECA rules."  Sanders spends one page in his seventy-page brief contending that FWR's practices were generally lawful.  But he fails to cite any authority or even the record, and he neglects to examine the evidence underlying each individual count.  His contention is therefore waived as inadequately briefed. *E.g.*, *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir. 1986).

the health care and wire fraud succeed.[19]

2.

"Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction. This is such a case." *United States v. Scott*, 892 F.3d 791, 799 (5th Cir. 2018) (footnote and quotation marks removed). Reviewing what is now familiar, Sanders, among other acts, pressured employees to maximize billings even when treatment was unnecessary. He fired an employee for refusing to lie on documents. He schemed with Mr. Rose to put Dr. Key at a noncomplying clinic to ensure that DOL would send payments. Those actions, among many others, show that there was "a community of unlawful intent between [Sanders] and the principal[s]" of the fraud. *Austin*, 585 F.2d at 1277 (brackets removed).

Sanders's main response is to point to evidence that he told employees not to do anything illegal. But that doesn't prove that the jury acted irrationally in convicting. *Cf. Bowen*, 818 F.3d at 186. For one, the evidence needn't "exclude every reasonable hypothesis of innocence." *Lugo-Lopez*, 833 F.3d at 457. And a jury could have inferred that Sanders knew he was crossing lines, because he felt a need to tell employees not to break the law.

Sanders also contends that the wire-fraud convictions should be set aside because there was "no evidence indicating Sanders played any role whatsoever in the actual process of submitting bills for payment." But, as an aider and abettor, there was no requirement that Sanders himself submit the fraudulent claims sent by wire. *See United States v. Rivera*, 295 F.3d 461, 466 (5th Cir.

---

[19] *See Barnes*, 803 F.3d at 216; *see, e.g., United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (assuming substantive prong of fraud count was satisfied because defendant conceded as much). Defendants in other health care fraud cases have proven capable of examining the evidence of substantive fraud underlying each count. *See, e.g., Martinez*, 921 F.3d at 472–73.

2002). Instead, the government needed only to show that he "assisted the actual perpetrator of the wire fraud crimes while sharing the requisite criminal intent." *Id.* For reasons already described, the government met that burden.

The evidence is also sufficient as to Mrs. Rose. As seen above, she was very involved in company discussions about maximizing billings. And she played a role in that company culture: She informed Dr. Smith that Smith needed to do more to increase revenues and informed her that her pay would be tied to her clinic's numbers. Mrs. Rose also helped to conceal the fraud by transferring FWR's money around various bank accounts once she'd learned that search warrants had been served. She was relieved to hear that listening devices hadn't been discovered in the executive office. All of that evidence supports that she knew about, participated in, and wanted to see the health care and wire fraud succeed. Accordingly, there is sufficient evidence supporting Rose's and Sanders's Counts 2–23 convictions for health care and wire fraud and aiding and abetting.

## C.

Mrs. Rose challenges the sufficiency of the evidence for her Count 24 conviction of conspiracy to launder money in violation of 18 U.S.C. § 1956(h). We affirm.

## 1.

Mrs. Rose's efforts to hide money from the government not only proved unsuccessful. They also put her in further legal trouble: namely, a charge of conspiracy to launder money. Count 24 accused Rose, along with her husband, of conspiring to "conduct financial transactions . . . with the proceeds of specified unlawful activity"—namely, the health care and wire fraud discussed above. The Roses' alleged objective was to conceal and disguise the nature,

No. 17-20492

location, and ownership of the criminal proceeds.

The indictment alleged that, soon after the search warrants were executed, the Roses transferred at least $190,000 in DOL payments out of various FWR bank accounts. The same day (July 11, 2013), they deposited that sum into a bank account held by "Reaching Out 2 Youth Corporation" ("RO2Y"), an account the Roses controlled. The Roses then met at a bank in Houston and withdrew the $190,000 from the RO2Y account via a cashier's check for $700,000. Mrs. Rose signed the withdrawal slip. The payee was Pure Vanity, and the remitter was "Glamor by Design, Inc." Mrs. Rose owned both of those corporations.

The next day, July 12, the Roses allegedly opened a new bank account in Pure Vanity's name and deposited the $700,000 check into it. Finally, three days later, the Roses transferred at least $130,000 out of the Pure Vanity account back into various FWR accounts. John Cruise testified that Mrs. Rose told him that she moved the funds around to hide them from the government.

2.

To prove an 18 U.S.C. § 1956(h) conspiracy to launder money, the government must show that (1) "there was an agreement between two or more persons to commit money laundering[,]"[20] and (2) "that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *Alaniz*, 726 F.3d at 601. Rose stresses that there was no evidence that she had the intent to further the unlawful purpose of any agreement. But she does not contest the evidence that the money transfers described above occurred. Nor does she contest that the money was proceeds of unlawful

---

[20] Money laundering generally requires that the defendant have engaged in a transaction with property he knew was derived from illegal proceeds. *See* 18 U.S.C. § 1957(a).

activity.  And she acknowledges Cruise's testimony that her goal was to hide the money from the government.  Yet that testimony is powerful indication that she knew about, and intended to further, an agreement to launder criminally derived property.

Rose also urges that there was no evidence that she was party to an illicit *agreement* with her husband to launder money.  But again, plenty of evidence suggests otherwise.  The grand jury alleged that Mrs. and Mr. Rose acted together in transferring the funds around, and John Cruise testified to the same.  "[Mrs. Rose] told me to meet them, her and [Mr.] Rose, at the . . . bank where we did our business," he stated, and "I was told that they were going to pull the money out of the business banking accounts."  That testimony was more than enough to establish that Mr. and Mrs. Rose had agreed with each other to launder money.  *See Frydenlund*, 990 F.2d at 825 (noting that agreements may be inferred from concert of action).

### D.

Mrs. Rose's final sufficiency challenge is to her Count 25 conviction of substantive money laundering and aiding and abetting in violation of 18 U.S.C. §§ 1957(a) and 2.  We affirm.

Mrs. Rose's money-laundering troubles followed her even after the initial bank transfers.  The grand jury alleged that almost a year later, the Roses withdrew about $27,000 from the Pure Vanity account to buy a cashier's check payable to Fort Bend Title.  The Pure Vanity account, of course, had been opened around the time of the Roses' post-warrant flurry of money transfers.  The cashier's check was then used to purchase a plot of land in Texas.  The check's acquisition was the basis for the Count 25 money-laundering charge.

To convict of money laundering under 18 U.S.C. § 1957(a), the

government must prove that "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *Martinez*, 921 F.3d at 476. Rose challenges only the third element, maintaining that she didn't know the funds used to buy the cashier's check were criminally derived. She relies on *United States v. French*, 748 F.3d 922 (9th Cir. 2014).

The conviction was sound. There is more than enough evidence that Mrs. Rose knew the funds were derived from unlawful activity. She opened the Pure Vanity account around the time of the search warrants and deposited the $700,000 in laundered funds into it, all as part of her scheme to "hide" the money from the government. The withdrawal described in this count came from that tainted Pure Vanity account.

*French* is unavailing. There, the Ninth Circuit reversed the defendant's two-count conviction of money laundering. *See French*, 748 F.3d at 936–37. The first count was reversed because there was no evidence that the defendant had purchased the relevant vehicle—instead, the defendant's husband had done so without her knowledge. *Id.* at 936. The second count met a similar fate, because the illicit money had been transferred into a bank account over which the defendant had no control, and there was no evidence that the defendant knew of the transfer. *Id.* at 936–37. Unlike the situation in *French*, however, there is plenty of evidence that Mrs. Rose knew the money used to purchase the check was derived from unlawful activity, and she controlled all the accounts involved in this scheme.

### III. MOTION FOR MISTRIAL

Defendants urge that the district court should've declared a mistrial. They take issue with an unusual string of events that led Judge Werlein to

invite a recalcitrant witness to his chambers for a meeting.  We affirm.

## A.

'Twas the middle of trial testimony on Thursday, September 22, 2016. The government wanted to call Blanca Ramirez, a former FWR technician.  But before Ramirez testified, Judge Werlein had the attorneys approach the bench. The judge informed the defense that "[l]ast evening after recess, the government" had notified the court's case manager that it had a witness—Ramirez— who "sounded like becoming defiant."  Ramirez had complained that "she had been here all day yesterday to testify" and had threatened not "to come back on her subpoena."  "Rather than come into court to make a big deal over it," Judge Werlein invited Ramirez to his chambers.  The prosecutors were present at the meeting but did not say anything.  The judge discussed Ramirez's obligation to testify, given that she was under subpoena.  "She was tearful at first" and "was frustrated," Judge Werlein explained.  He reminded her that "[i]t would be ugly if" she didn't testify and was instead subjected to a bench warrant.  Finally, Ramirez quit her resistance.  After being notified, defense counsel did not object.  Ramirez proceeded to testify for the rest of the day.

Trial resumed the following Monday, four days later.  But before Ramirez retook the stand, Mr. Rose's counsel approached the bench and objected "to improper ex parte communication" under Federal Rule of Criminal Procedure 43.  On that basis, he moved for a mistrial or to strike Ramirez's testimony.  Multiple times he clarified that he had no quarrel with how Judge Werlein had handled the situation.  Instead, he contested the government's failure to loop in defense counsel when the bench warrant was requested.

The prosecutor explained in response that the government had sought an after-hours bench warrant when it learned that Ramirez wanted to go on vacation to Florida instead of testifying.  Judge Werlein confirmed the

prosecutor's account, explaining that Ramirez was only tired of waiting to testify.  Judge Werlein thought that, before initiating the messy process of issuing and enforcing a bench warrant, it would've been easier to speak with Ramirez in hopes she'd have a change of heart.

Judge Werlein carried the mistrial motion, and Ramirez resumed her testimony.  Later in the day, all four defendants moved in writing for a mistrial.  They contended only that the government's *ex parte* communications "relative to [its] witness" violated Rule 43.  Without citation, they asserted that the district court's local rules had been violated because the government hadn't first consulted defense counsel before requesting a warrant.

Judge Werlein denied the motion.  He noted that he had spoken *ex parte* with a witness, not the jury, which would've been a more serious situation. Further, the government's *ex parte* request for a warrant didn't concern the case's merits.  Instead, it was an emergency measure necessary to secure testimony from a witness under subpoena.  Finally, the judge noted that when he had first brought the matter up, "[n]o one objected at the time.  And then there was a whole three days['] waiting period before three of the defendants did cross-examination, and still no one asked her anything about it.  It was a nonevent."  Rose and Sanders now contend that Judge Werlein erred in refusing to declare a mistrial.

## B.

We usually review a denial of a motion for a mistrial for abuse of discretion.  *See Velasquez*, 881 F.3d at 343.  But where counsel does not object contemporaneously to the actions that form the basis for the mistrial motion, plain error review follows.[21]  Such a requirement gives the district court the

---

[21] *See United States v. Harms*, 442 F.3d 367, 378 (5th Cir. 2006) (applying plain error

chance to fix the mistake or take measures to reduce any prejudicial effect. *See Puckett v. United States*, 556 U.S. 129, 134 (2009).

Rose and Sanders failed to comply with that requirement, so we review only for plain error.[22] No one objected when Judge Werlein first informed defense counsel that he'd spoken with Ramirez. Ramirez testified for the rest of the day, and counsel never cross-examined her about the encounter. It wasn't until four days later that counsel for Mrs. Rose and Sanders moved for a mistrial. By waiting so long to raise their objection, the lawyers robbed Judge Werlein of any opportunity to reduce the prejudice.[23]

Moreover, plain error applies when "the basis for [the defendant's] objection during trial is different from the theory [s]he . . . raises on appeal." *United States v. Green*, 324 F.3d 375, 381 (5th Cir. 2003). Repeatedly, Mr. Rose's counsel told Judge Werlein that he had no issue with how *the judge* had handled the situation. And the later-submitted written motion sang the same tune, complaining only of the prosecution's actions. Now, Rose and Sanders assert—rather darkly—that Judge Werlein implicitly coerced Ramirez into

---

review to denial of mistrial because "Harms objected to the remark after the conclusion of closing argument and out of the jury's presence"); *United States v. Caucci*, 635 F.2d 441, 448 (5th Cir. Unit B Jan. 1981) (applying plain error "[b]ecause Caucci's motion for a mistrial was not made until after the conclusion of the summation and because he failed to object to the prosecutor's comments when made"); *see also United States v. Pena*, 71 F. App'x 367, 368 (5th Cir. 2003) (per curiam) ("Because Pena failed to timely object to the admission of the evidence upon which his motion for mistrial is based, we review this issue only for plain error.").

[22] *See United States v. Roberts*, 913 F.2d 211, 216 (5th Cir. 1990) (establishing that plain error review can apply when a party fails to object to *ex parte* communications).

[23] Of course, neither Rose nor Sanders had a chance to object when Judge Werlein invited Ramirez into chambers, because they didn't know it was happening. Perhaps for that reason, Rose contends that she raised the objection at a practicable time. But defendants' silence when Judge Werlein first brought the matter up still requires plain error review. *See Pena*, 71 F. App'x at 368. If defense counsel had objected at that time, Judge Werlein could have considered various mechanisms to reduce the prejudicial effect. But because defendants failed timely to object, the error was sown into the record when Ramirez started testifying. *See Puckett*, 556 U.S. at 134.

No. 17-20492

testifying favorably for the government.  Plain error review applies.  Naturally, the first prong of plain-error analysis is the requirement of an error.  *United States v. Daniel*, 933 F.3d 370, 382 (5th Cir. 2019).  There is none.

C.

At the district court, the defendants relied only on Federal Rule of Criminal Procedure 43 in requesting a mistrial.[24]  That rule provides that "the defendant must be present at . . . every trial stage."  FED. R. CRIM. P. 43(a)(2).  The rule does not, however, require the defendant's presence when "[t]he proceeding involves only a conference or hearing on a question of law."  FED. R. CRIM. P. 43(b)(3).  Citing that latter provision, the government contends that neither its request for a bench warrant nor Judge Werlein's and the prosecution's subsequent meeting with Ramirez were subject to Rule 43 because they involved only a conference on a legal question.

We agree with the government.  In *United States v. Cornett*, 195 F.3d 776, 781 (5th Cir. 1999), we concluded that a hearing about possible juror misconduct involved a question of law and hence didn't trigger Rule 43.[25]  If a hearing about a *juror's* misconduct presents a question of law, *see Cornett*, 195 F.3d at 781, then so too does a conference about a *witness's* misconduct.  There is no reason to treat the two situations differently in this regard.  The government's last-minute motion, and the judge and government's meeting with Ramirez, were "an efficient way to assess the extent of any [witness]

---

[24] They've also maintained that the government violated a district court rule in failing to keep them in the loop.  At no point, however, have they identified the rule.  Nor have they explained why it could serve as a basis for a mistrial.  Their contention is therefore waived as inadequately briefed.  *E.g.*, *United States v. Davis*, 603 F.3d 303, 307 n.5 (5th Cir. 2010).

[25] *See also United States v. Peterson*, 385 F.3d 127, 138 (2d Cir. 2004) (holding that the question-of-law exception applied to a judge's private conversation with a juror about jury misconduct).

misconduct and formulate an appropriate response." *Peterson*, 385 F.3d at 138. Thus, at the first step of the plain error analysis, the district court didn't err. *See Daniel*, 933 F.3d at 382.

### D.

Rose and Sanders rely on *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), and *United States v. Stratton*, 649 F.2d 1066 (5th Cir. Unit A July 1981), in contending that the court erred in inviting Ramirez to chambers.[26] Defendants seem to think that *Gypsum* and *Stratton* prove a violation of their due process right of presence. Plain error review applies, because defendants never told the court that they objected to how it had handled the odd situation.

Regardless, neither case is apropos. Both involved more serious and more prejudicial *ex parte* communications. *Gypsum*, 438 U.S. at 462, dealt with what was effectively an *ex parte* supplemental instruction to the jury. And *Stratton*, 649 F.2d at 1081, concerned a novel severance procedure that basically prevented the defendant from being present at the guilt phase of his own trial. This case, by stark contrast, involves a sensible attempt by a longtime district judge to reason with a witness who threatened to hike off early to vacation. *Gypsum* and *Stratton* are seated in a different ballpark.

Moreover, a criminal defendant has a due-process right to be present at

---

[26] Indeed, Rose and Sanders accuse Judge Werlein of coercing Ramirez into testifying favorably for the government. That is a serious accusation seriously lacking in evidentiary support. Judge Werlein explained that Ramirez wasn't generally unwilling to testify. She did not, for example, fear retribution for her testimony. Instead, she wanted to head off for vacation. There is no support for the charge that the judge somehow dictated the contents of Ramirez's testimony or encouraged her to testify in a way that pleased the prosecution.

In response, Rose complains that she can't verify what Ramirez's reason for hesitating was, because counsel wasn't a part of the meeting and a transcript wasn't created. Yet despite ample opportunity, Rose's lawyer failed to cross-examine Ramirez about the encounter. Rose cannot complain that she had no way of knowing.

No. 17-20492

a proceeding only where his presence might affect "his opportunity to defend against the charge" or "thwart[]" the possibility of "a fair and just hearing."[27] Here, neither defendant's presence would have made any difference. Ramirez was going to testify one way or another—either voluntarily on her subpoena or involuntarily under a bench warrant. Defendants had no right or ability to prevent Ramirez from taking the stand, so they "could have done nothing had they been at the conference, nor would they have gained anything by attending." *Gagnon*, 470 U.S. at 527. "There is nothing [defendants] could [have] do[ne] if [they] were there, and almost nothing [they] could [have] gain[ed]." *Snyder*, 291 U.S. at 108.

## IV. CRIMINAL FORFEITURE

Mrs. Rose was ordered to forfeit six properties after a forfeiture jury trial. She contends that the government failed to prove the required statutory nexus for the forfeitures. We affirm.

### A.

The second superseding indictment notified the Roses that the government sought forfeiture of

(a) At least $8,925,388.00.

(b) A 1.026 acre lot in Fort Bend County, Texas, owned by the Roses.

(c) $63,309.61 seized from a BWR bank account.

(d) $90,392.46 seized from a FWR bank account.

(e) $41,397.37 seized from a FWRN bank account.

(f) $25,707.93 seized from a TWR bank account.

(g) An annuity contract held by the Roses.

---

[27] *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam); *see also Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934) (holding that defendant had no right of presence at jury's viewing of the crime scene because he couldn't have gained anything from being there), *overruled in unrelated part by Malloy v. Hogan*, 378 U.S. 1 (1964).

No. 17-20492

The Roses asked to retain the same jury to decide the forfeiture, so the district court presided over a forfeiture jury trial. *See* FED. R. CRIM. P. 32.2(b)(5)(A) (permitting guilt-phase jury to decide criminal forfeiture). At that trial, Special Agent Lucy Tan testified about her review of the bank accounts, annuity, and plot of land. She stated that the overwhelming majority of the funds—at least ninety percent, usually more—in each of the accounts came from DOL payments. Using the first-in-first-out ("FIFO") accounting method, Tan also traced the real property back to federal money.

Despite not taking the stand during the guilt phase, Mrs. Rose testified. She contended that some of the money in the accounts, and the money used to purchase the land, came from non-DOL sources, such as personal-injury patients or other lines of business. She also claimed that her tax records suggested the government had incorrectly estimated the amount of DOL revenue.

The jury determined that the bank accounts, annuity, and real property were forfeitable.[28] The first two were traceable to the conspiracy to commit health care fraud charged in Count 1.[29] And the real property was both traceable to the Count 1 conspiracy and involved in the Count 25 money laundering offense. The forfeitures were finalized at sentencing.

B.

We review the jury's verdict regarding criminal forfeiture for sufficiency of the evidence.[30] Criminal forfeiture "is an aspect of punishment" and hence

---

[28] The jury didn't determine, and Rose doesn't contest, item (a). The district court later ordered a money judgment of $14,537,548.54.

[29] For the accounts, the jury found that the entire listed amounts were forfeitable. But for the annuity, the jury found that $98,601.47 of the $100,000 used to purchase it was criminal proceeds.

[30] *See United States v. Vogel*, 459 F. App'x 439, 442 (5th Cir. 2012) ("[A] rational jury could have concluded there was a preponderance of evidence that all prescriptions issued by

"an aspect of sentencing." *Id.* (quotation marks removed). District courts must order the forfeiture of property connected to health care fraud and money laundering. *See* 18 U.S.C. § 982. "[S]tatutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence." *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003).

Where the government wants to forfeit "specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." FED. R. CRIM. P. 32.2(b)(1)(A). The government seeks forfeiture of Mrs. Rose's properties under two nexus theories. The first is 18 U.S.C. § 982(a)(7), which states that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." The second is § 982(a)(1), which mandates that "[t]he court, in imposing sentence on a person convicted of [money laundering] . . . , shall order that the person forfeit . . . any property, real or personal, involved in such offense, or any property traceable to such property."

In *United States v. Ayika*, 837 F.3d 460, 468 (5th Cir. 2016), we confronted criminal forfeiture in the health care fraud context. The defendant ran a pharmacy and was convicted of health care fraud in connection with false claims for benefits. *Id.* at 463–64. The district court ordered forfeiture of several assets, including funds in the pharmacy's main bank account. *Id.* at 468–69. The defendant contended, as Rose does, that some of the funds deposited into that account over its life came from legitimate sources such as lawful billings, thus precluding forfeiture. *Id.* at 470.

---

MPC were invalid, so all of its $26.3 million in revenue was subject to forfeiture."); *see also United States v. Betancourt*, 422 F.3d 240, 252 (5th Cir. 2005).

Applying § 982(a)(7)—one of the provisions at issue here—we held that the government hadn't shown that the funds in the account were directly or indirectly derived from the health care fraud. *Id.* at 474. We noted that it's difficult "to determine the exact source of any specific dollar or dollars" where "legitimate money and illegitimate money are placed in the same account, and various withdrawals and other deposits occur over time." *Id.* at 472. In light of that difficulty, we interpreted the "requirements of tracing under § 982(a)(7) . . . to be demanding for establishing forfeiture." *Id.* at 474. And because the government conceded that only about thirty-four percent of the funds deposited into the account were proceeds of the health care fraud, *id.* at 471 n.17, the seized funds were not traceable to that offense, *id.* at 474. Rose suggests that her case is similar, inasmuch as some of the accounts had non-federal money at the time of the seizures.

## C.

First, we analyze the forfeitures of the annuity and the amounts in the bank accounts. Rose maintains that this case is like *Ayika*, but there are salient differences. Most importantly, in *Ayika* the government conceded that only about a third of the money placed in the account over its lifetime was proceeds of the health care fraud. *Ayika*, 837 F.3d at 471 n.17, 474. By contrast, here the government persuasively contends that there was a "mountain of evidence that every claim filed by FWR was fraudulent in multiple ways"—in that billed services often weren't necessary or provided one-on-one by a licensed professional, among other things.

Sister circuits applying other provisions have upheld forfeiture where there's evidence of pervasive illegality at the institution, such that the "fraud

touched everything."[31]  FWR is one such institution, because there is no evidence that *any* OWCP billing it ever made was legitimate.[32]  Instead, the evidence suggested that each claim was fraudulent in at least one and often multiple ways.

Rose's strongest response is her point that some of FWR's earnings—and hence the money in the bank accounts—came from *non*-DOL sources, such as personal-injury patients.  Hence, she continues, some of the seized funds may not have been tainted.  But those other funds do not invalidate the forfeiture.  Tan testified, without rebuttal, that at least ninety percent of the clinics' revenues came from DOL, which leaves only *de minimis* non-DOL revenue in the accounts.[33]  And even that *de minimis* non-federal money is traceable to the fraud.  That is because, in a company with such widespread deceit as FWR, a jury could have believed that FWR couldn't have existed absent the fraud.  The government's burden was only to show that the seized money "constitute[d] . . . gross proceeds *traceable to* the commission of the offense."  18 U.S.C. § 982(a)(7) (emphasis added).  If the business couldn't have existed absent the fraud, then even the non-DOL revenue traces to it.[34]

---

[31] *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014) (affirming criminal forfeiture of two checks drawn from a company's accounts, because the company "was used as a vehicle to commit fraud" and the "fraud touched everything"); *see United States v. Warshak*, 631 F.3d 266, 332–33 (6th Cir. 2010) (affirming criminal forfeiture of company's revenues, because "the entire operation was permeated with fraud," and any "legitimate" sales also indirectly derived from the conspiracy, since the company "would have been unable to conduct" those sales if the scheme "had never been implemented").

[32] *See United States v. Bogdanov*, 863 F.3d 630, 634 (7th Cir. 2017) ("[Defendant] marshaled no evidence showing that any of the alleged goods in question were obtained legitimately. . . .").

[33] *See United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992) ("Even if the fraud stopped at the end of 1988, the criminal proceeds vastly exceed the sums on deposit at the time of the seizure.").

[34] *See United States v. Juluke*, 426 F.3d 323, 327 (5th Cir. 2005) (per curiam) (drug case) (agreeing with the district court's reasoning, in affirming forfeiture, that even if "some

No. 17-20492

Rose misfires in suggesting that it was problematic that Tan couldn't say exactly how each individual dollar in the accounts was fraudulently derived. The government's burden was to show a nexus to the conspiracy, not the specific form that the fraud took with respect to every billing FWR ever submitted. *See* 18 U.S.C. § 982(a)(7). In sum, the government proved the requisite nexus between the bank account and annuity forfeitures and the Count 1 conspiracy conviction.

## D.

Rose maintains that there was no link between the forfeited real property and her offenses. The jury found that the real property was forfeitable on two theories: (1) The check used to purchase it was connected to the Count 1 conspiracy, and (2) the land was involved in the Count 25 money laundering. We need not review the parties' extensive briefing on the first theory, because the second one is easily met. Mrs. Rose's purchase of a cashier's check, which was used to buy the real property, was the basis for her Count 25 money-laundering conviction. The land is therefore "involved in" that offense. 18 U.S.C. § 982(a)(1).

AFFIRMED.

---

of the money in the account could have come from legitimate sources, . . . any legitimate income in the account served to facilitate Juluke's illegal activity"); *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) ("The amounts that [defendant] received from private insurance companies and patients are gross proceeds traceable to the commission of her fraud because, but for her Medicare fraud, she would not have been entitled to collect these sums from the companies and patients." (quotation marks removed)); *Warshak*, 631 F.3d at 332–33 ("[A]ny sales post-dating the bank-fraud counts were proceeds resulting indirectly from fraud, as [the company] would have been unable to conduct credit-card transactions if the [fraud] scheme had never been implemented.").